**AMERICAN AIRLINES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–668T.**

United States Court of Federal Claims.

April 17, 1998.

---

Peter Dean Isakoff, Weil, Gotshal & Manges, Washington, DC, for Plaintiff.

William Kenneth Drew, U.S. Dept. of Justice, Tax Division, Claims Court Sector, Washington, DC, for Defendant.

*Order and Opinion* [1]

WEINSTEIN, Judge.

Plaintiff, American Airlines, Inc. ("American"), seeks a refund of $15,140,328 in federal income withholding taxes, employer and employee Federal Insurance Contributions Act taxes ("FICA"), and related interest and penalties that were assessed on certain benefits provided to its employees during the calendar years 1985 through 1988, plus interest and costs. Plaintiff contends that these benefits were exempt from federal employment taxes. The parties have cross-moved for summary judgment. Plaintiff's motion is denied. Defendant's cross-motion is granted.

*Facts*

*"Meal" Per Diems*

The following facts are largely undisputed.[2] During the years at issue, each pilot, flight engineer, and flight attendant employed by American (collectively, "flight crew employees") was assigned to a crew base. Flight crew employees' duty assignments began and ended at the assigned crew base. Duty assignments were of two types: trips requiring one or more overnight stays away from the crew base ("overnight trips") and trips involving no overnight stay ("turnaround trips"). Ninety-two to ninety-five

---

**1.** This order originally was filed on April 2, 1998. It is being reissued for publication with minor revisions not affecting the substance of the decision.

**2.** Plaintiff disputes defendant's proposed findings (DPFUF 5, 6, and 11) that American's labor negotiator did not rely on the cost studies presented by the pilot's union in negotiating the per diem rates, that the per diems were solely for meals, and that the American Express vouchers also could be used at non-restaurant establish-

ments accepting the American Express card. However, because actual reliance is not at issue (only what a reasonable person would have thought), plaintiff's dispute regarding its reliance on the study does not concern an issue of material fact. Plaintiff's disputes regarding whether the per diems were solely for food or included other incidental expenses or whether the vouchers could be used at non-restaurant establishments also do not concern issues of material fact for the reasons discussed below.

percent of the trips flown were overnight trips; the remainder were turnaround trips. During overnight trips, American provided lodging and transportation between the lodging and the airport, and employees paid their other expenses (such as meals, taxis to and from restaurants, phone calls, tips, and laundry/dry-cleaning).

Pursuant to collective bargaining agreements in force during the relevant times, flight crew employees were given a per diem, nominally for "meals," but evidently to cover other incidental expenses as well.[3] This per diem was paid at the rate of $1.50 per duty hour ($1.45 for pilots and flight engineers prior to August 1, 1985). Employees were not limited to per diem "meal" payments, and could seek reimbursement of other non-lodging expenses. See Pasciuto Decl., Exh. D (Flight Attendants' Employment Agreement) (emphasis added) ("Expenses, *other than meal expenses,* incurred while on flight duty or on special assignments shall be payable in accordance with applicable Company expense regulations"); Pasciuto Decl., Exh. F (Pilots' Agreement) at § 11D ("Any other expenses incurred shall be in accordance with Company regulations and with Company approval.") See also Pasciuto Decl., Exh. A, p. 24 ("not only did we have meal and miscellaneous expenses under the agreement, we also have moving expenses . . .").

Wages and per diem payments were included in a single paycheck, but the paycheck stubs separately identified the portion for each. They were commensurate to per diem rates in the airline industry. Pasciuto Decl. ¶ 14, Exh. G. On-duty hours commenced at the time of reporting for the departure trip and concluded after the debriefing held upon return. Pasciuto Decl. Exhs. B–D [Including deadhead times].

Flight crew employees were not required to substantiate their expenses. Pilots and flight engineers based in Dallas–Fort Worth (DFW) received eight hours of this per diem for each day of training at the DFW training facility. The rates did not vary to reflect travel in higher (or lower) cost areas.

The per diems were the product of arm's-length, good-faith negotiations between American (Charles A. Pasciuto was American's chief labor negotiator) and the flight crew employee unions. They were negotiated separately from wages and other rates. American claims it relied on the personal travel experience of its chief labor negotiator and his staff; the per diem rates paid by other airlines and certain government agencies; and a study of business travel costs provided by the pilots' union and prepared by Runzheimer International, a well-known management consulting firm specializing in travel and living costs, in negotiating the per diem and concluding that actual travel costs would, in fact, exceed the per diem.[4] American did not perform its own cost study. Pasciuto Decl., Exh. A at 28. Nor did it "ever bring in any experts to discuss meal payments." Id. at 39. The negotiating parties did not discuss the tax treatment of such benefits. Pasciuto Decl. Exh. A at 64–66. American claims it had a reasonable expectation that the flight crew employees' actual business expenses exceeded the per diem and that reviewing employee expense reports would have been "exceedingly burdensome." This is a question of law to be determined on the basis of the admissible undisputed facts. See West v. State Farm Fire and Cas. Co., 868 F.2d 348, 350 (9th Cir.1989) ("reasonableness . . . becomes a question of law and loses its triable character if the undisputed facts leave no room for a reasonable difference of opinion.")

*Boarded Meals*

The union contracts also required American to provide meals on board ("boarded

3. Mr. Pasciuto stated, in his deposition, that everyone knew during negotiations that "meals" included all expenses other than lodging. Pasciuto Decl., Exh. A, p. 14–16.

4. The conclusions of that study are hearsay and *not supported by affidavits as required by Appendix H. Even if admissible, the methods and control factors used in developing or making the study, which could influence its accuracy, reliability and applicability to these facts, are not evident. For example, the study appears to focus on high-priced areas such as Manhattan (which has no airport), and even for many of these high-priced areas, total daily meals are valued well under $36.00. Even American's labor negotiator, Mr. Pasciuto, questioned their accuracy and credibility, stating in deposition: "the pilots were famous for always trying to get someone to study the aches and pains that they experienced in their careers. And . . . they used to refer to some report that they would come in—and frankly as a company negotiator, I was very, very careful not to dignify all of the reports or data that they came in with. . . ." Pasciuto Decl., Exh. A, p. 19. Also: "I didn't like using union data." Id. at 24.

meals" or "on-board meals") for pilots and flight engineers on flights of certain lengths and at certain times of day. The meals were the same served to the passengers and were provided as a "safety measure."

*American Express Vouchers*

In 1985, a major competitor's labor strike forced American's employees to deal with substantially heavier than normal passenger loads. As a gesture of appreciation, American gave each employee two $50.00 "Be My Guest" vouchers. These were blank American Express charge forms bearing American's account number and an amount of "not to exceed fifty dollars." This was American's only company-wide credit card voucher program during the years at issue.

American intended the employees to use the vouchers for meals, in lieu of a gigantic thank-you dinner. American's letter accompanying the vouchers said they were good only at restaurants honoring the American Express card. McGinn Decl., Exh. C. The facts are in dispute as to whether the vouchers actually could be used at other businesses accepting American Express, or for purposes other than meals. Compare SPPFUF 5, citing Schwartz Decl.¶ 6 at App. to Pl. Reply and Opp. (it would have been "extremely difficult" to redeem the vouchers at non-restaurant merchants) with Robertson Decl., Exh. B (deposition of Robert Bagley), p. 20 (stating that the vouchers could have been used at non-restaurant merchants). The vouchers did not contain the employees' names or any transfer restrictions, and thus on their face could be used by anyone. Robertson Decl. Exh. B at 18. If the bill was under fifty dollars, the balance was not refunded. McGinn Decl. Exh. C. The vouchers were distributed in June 1985, and expired on December 31, 1985. Robertson Decl. Exh. B at 21. Vouchers with total face values of $4,250,000 were issued, of which $4,139,100 worth (over 97%) were redeemed.[5] American claims it would have been administratively impracticable to track which employees used the vouchers. Defendant counters that any impracticability was due to

American's decision to put the program in place very quickly. Furthermore, the payment would be deemed made at the time the vouchers were sent out, not when they actually were spent. Defendant contends that, since vouchers were sent to everyone, it should not have difficult to add $100 to each employee's pay and make withholding payments on that amount.

*Tax Treatment*

American did not withhold federal employment taxes or report income from meal allowance payments until July 1, 1988, when, in response to positions taken by the Internal Revenue Service (IRS), it began to withhold federal employment taxes with respect to turnaround trip payments only. During the entire period at issue, American did not report, or withhold taxes for, the value of the on-board meals provided to pilots and flight engineers, or the value of the vouchers.

On January 31, 1992, the IRS completed an examination of American's income reporting and withholding compliance during the years at issue. It concluded that American should have treated as wages, and withheld employment taxes from: a) one-sixth of all per diem payments for overnight trips, *i.e.*, the portion exceeding thirty dollars for a twenty-four hour period, b) all per diems for turnaround trips and DFW training, c) ten dollars for each on-board meal provided to pilots and flight engineers, and d) the full face value of the American Express vouchers. McGinn Decl. Exh. D. Upon appeal, the IRS Appeals Office on March 30, 1993 issued a final proposed assessment of $14,800,374 in taxes and $339,954 in penalties (a total of $15,140,328). McGinn Decl. Exh. F. American paid the assessment on April 2, 1993, and filed refund claims for the full amount on June 7, 1993. The IRS disallowed the claims on November 22, 1994, and American filed suit in this court on October 6, 1995.

*Standard of Review*

Summary judgment is appropriate when there is no genuine issue as to a fact that is

---

**5.** This is equivalent to 42,500 employees redeeming $97.40 each ($2.60 less than the face amount) or to 1109 employees redeeming none and 41391 redeeming the full face amount.

material to establishing plaintiff's claim and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the Court of Federal Claims (RCFC); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A material fact is one that is relevant and necessary to establishing or defending against the claim and that may affect the outcome of the decision; an issue is genuine if a reasonable finder of fact could decide the question in favor of the non-movant. *Key-Stone Retaining Wall Sys., Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1449 (Fed.Cir.1993); *Opryland USA Inc. v. Great Am. Music Show, Inc.,* 970 F.2d 847, 849–50 (Fed.Cir.1992). That both parties have moved for summary judgment does not establish the absence of any genuine issue of material fact, nor require the court to grant summary judgment to either side. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir. 1988); *Mingus Constr. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). *See also Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987).

Plaintiff claims that the meal money allowances and the boarded meals for pilots and flight engineers qualify as travel expenses excludable from wages or, alternatively, as "working condition" fringe benefits. Plaintiff argues that the American Express vouchers qualify as a "de minimis" fringe benefit under § 132(a)(4). Defendant's position is that the law is unclear as to whether post–1984 travel expenses had to both qualify as "work-ing condition" fringe benefits and satisfy the travel expense regulations, but that this is immaterial since the per diems satisfied neither provision. Defendant contends that the vouchers are not "de minimis" fringe benefits, because they are cash equivalents.

### Applicable Law

*Travel Expense Exclusion from Wages*

Section 3101 of the Federal Income Contributions Act ("FICA" or "Social Security Act"), codified at Federal I.R.Code [6] §§ 3101 through 3128, imposes a tax on the wages of an employee. The tax is collected at the source and remitted to the Government by the employer. § 3102. Section 3111 imposes an excise tax on wages of an employee payable by the employer.

"Wages" is defined under FICA as: "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash …" § 3121(a).

Certain employer payments are exempt from FICA, for example: payments to health plans and qualified retirement plans, noncash remuneration, such as payment in kind for domestic service or agricultural labor. *See* § 3121(a)(2), (5), (7), and (8). A "traveling expenses" exclusion is established by Treas. Reg. § 31.3121(a)-1(h) [7] which provides:

"Amounts paid specifically—either as advances or reimbursements—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages. Traveling and other reimbursed expenses must be identified either by making a separate payment or by specifically indicating the separate amounts where both wages and expense allowances are combined in a single payment."

This language has been in effect since 1950. The prior regulations requiring substantiation of expenses were revised in 1950 to condition exclusion on specifically identify-

---

**6.** Citations to the Internal Revenue Code ("I.R.Code" or "Code") are to the I.R.Code of 1954, as amended, as codified at 26 U.S.C. and in effect at the relevant time.

**7.** Citations to sections of the Treasury Regulations ("Treas.Reg.") are to the regulations codified at 26 C.F.R., as in effect at the relevant time.

ing the payment, as an advance or reimbursement for traveling or other expenses, at the time of payment.

I.R.Code § 3402 requires employers to withhold wages for payment of an employee's income taxes. "Wages" are defined to include "all remuneration," subject to stated exceptions. *See* I.R.Code § 3401(a). The travel expense regulation, § 31.3401(a)–1(b)(2), excepts "traveling and other expenses." These expenses are defined, precisely as in § 31.3121(a)-1(h), as:

> Amounts paid specifically—either as advances or reimbursements—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages and are not subject to withholding. Traveling and other reimbursed expenses must be identified either by making a separate payment or by specifically indicating the separate amounts where both wages and expense allowances are combined as a single payment.

Thus, the FICA and FIT travel expense regulations are essentially identical.[8]

*Working Condition Fringe*

Section 132(a)(3) excludes from gross income any fringe benefit that qualifies as a "working condition fringe". Section § 132(d) defines a "working condition fringe," as "any property or services provided to an employee of the employer to the extent that, if the employee paid for such property or services, such payment would be allowable as a deduction under section 162 or 167." A deduction is allowed under § 162(a) for "all ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business, including ... (2) traveling expenses (including amounts expended for meals ... ) while away from home, in the pursuit of a trade or business." However, no deduction is allowed "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense ..., (B) the time and place of the travel ..., (C) the business purpose ..." § 274(d). Section 274(d) states that regulations may provide that some of its requirements shall not apply for an expense not exceeding a certain minimal amount.

Subsequent to December 31, 1984, a fringe benefit was excludable from wages for employment tax purposes only if it was reasonable for the employer to believe that the fringe benefit would be excludable from the employee's gross income under § 132. *See* § 3401(a)(19); § 3121(a)(20). This is an objective standard. *See. e.g., Jeppsen v. Commissioner,* 128 F.3d 1410, 1418 (10th Cir. 1997) (in determining whether taxpayer qualifies for income tax deduction for theft loss, reasonableness of taxpayer's prospect of recovering stolen assets is primarily tested objectively rather than by taxpayer's subjective assessment of his own prospect of recovery).

*De Minimis Fringe Benefits*

Also excluded by § 132(a) from gross income are "de minimis fringe benefits," § 132(a)(4), defined in § 132(e) as "any property or services the value of which is (after taking into account the frequency with which similar fringes are provided by the employer to the employer's employees) so small as to make accounting for it unreasonable or administratively impracticable." § 132(e).

*Requirement that Withholding Obligation be Precise and Non–Speculative*

■ Since "the employer is in a secondary position as to liability for any tax of the employee, it is a matter of obvious concern that ... the employer's obligation to withhold be precise and not speculative." *Central Ill. Pub. Serv. Co. v. United States,* 435 U.S. 21, 31, 98 S.Ct. 917, 923, 55 L.Ed.2d 82 (1978). A duty to withhold income taxes on payments made to its employees should not be imposed retroactively on an employer unless there was adequate notice (from the relevant statutes, regulations, and IRS pronouncements) to the employer at the time of the payments that such a withholding obligation existed. *See Humble Oil & Refining*

---

8. These travel expense regulations were originally issued in 1943, *see Central Ill. Pub. Serv. Co. v. United States,* 435 U.S. 21, 30, 98 S.Ct. 917, 922, 55 L.Ed.2d 82 (1978), and apply to payments prior to July 1, 1990.

*Co. v. United States,* 194 Ct.Cl. 920, 442 F.2d 1362, 1369–70 (1971) (holding that the employer was not required to withhold income tax from its payments of moving expenses to its existing employees where the state of the law in 1961 gave the employer no reason to suspect that such payments constituted "wages"). *See also Hotel Conquistador, Inc. v. United States,* 220 Ct.Cl. 20, 597 F.2d 1348, 1354 (1979) (holding that the employer was not required to withhold or pay FICA and FUTA taxes in 1971 with respect to the free meals it furnished its employees because the employer could not have told from the relevant statutes and regulations that the free meals were "remuneration" and thus "wages").

■ The burden is on American, as the refund applicant, to show that the benefits at issue in this case were not subject to withholding and FICA taxes or, at least, that American could not have known, by examining the relevant statutes, regulations, and IRS pronouncements, that it had withholding and FICA obligations with respect to such benefits. *See Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932) (in tax refund suit, the taxpayer has burden of proving not only that it overpaid its taxes but also the amount of its overpayment.)

### Discussion

### "Meal" Per Diems

Payment of personal expenses is remuneration or wages, subject to withholding and FICA taxes; payment for expenses incurred on the employer's behalf are not, as long as such payment amounts are not more than those "reasonably expected to be incurred," and the payments otherwise meet the regulatory requirements for exclusion from wages. *See* § 31.3401(a)-l(b)(2) and § 31.3121(a)–1(h). The parties agree that the meal allowance payments meet the regulatory requirements that they be paid specif-

ically as advances or reimbursements for traveling expenses and that the amounts paid for traveling expenses be specifically identified.

Plaintiff contends that, in Rev. Rul. 55–196, 1955–1 C.B. 492, the Service concluded that when allowances for traveling expenses are paid pursuant to an employment contract, the existence of the contractual provision, in and of itself, meets the requirement that the amount of the allowances do not exceed those expenses reasonably expected to be incurred. There, an agreement between a traveling salesman employed on a straight commission basis and his employer provided that part of his commission was a reimbursement for his traveling expenses. Rev. Rul. 55–196, 1955–1 C.B. at 492. The IRS concluded that "[a] provision in an oral or written contract of employment or in a collateral agreement, to the effect that any payments made or advanced against earned commissions are first to be applied to reimburse the traveling salesman for traveling or other bona fide ordinary and necessary expenses," would satisfy the travel regulations' requirement that the amounts be "paid specifically ... for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred." *Id.* at 492–493.

However, as defendant correctly contends, the IRS, in the revenue ruling, concluded only that the agreement satisfied the requirement that the amounts paid to reimburse (presumably previously-incurred) expenses be paid *specifically* for traveling expenses.[9] *Id.* The ruling did not, as plaintiff suggests, address the issue of whether the existence of an employment agreement, setting the amounts to be paid as advances toward expenses to be incurred at a later time, makes those amounts "reasonably expected" to be incurred.

The dispute here is whether the expenses, which were not shown to be actually in-

9. The IRS has consistently interpreted Rev. Rul. 55–196 to stand for this narrower proposition. *See. e.g.,* Tech. Adv. Mem. 9146003 (Nov. 15, 1991) ("Rev. Rul. 55–196 ... holds that a provision in an oral or written contract of employment or in a collateral agreement (either express or implied), to the effect that any payments made or advanced against earned commissions are first to be applied to reimburse the traveling salesman for traveling or other bona fide ordinary and necessary expenses, will satisfy the first requirement of the regulations that the amount be paid specifically as an advance or reimbursement.")

curred, were "reasonably expected to be incurred." Thus, the issue before the court is whether it was *objectively reasonable* to believe that employees would spend $36 or more on meals and other unpaid expenses (meals, tips, phones and dry cleaning) when they were away from home. While plaintiff or its negotiators may in fact subjectively have believed that such expenses in this amount would be incurred, the test is objective—whether a reasonable person would so conclude. *See generally General Elevator Corp. v. U.S.*, 20 Cl.Ct. 345 (1990) (testimony from taxpayer's witnesses that per diem allowances "reasonably approximated" employees' average travel costs was not persuasive since it was not supported by any objective evidence). The burden of proving that it was objectively reasonable to treat $36 a day as "meal" expenses, as in all taxpayer refund actions, is upon the taxpayer. *See Lewis*, 284 U.S. at 283, 52 S.Ct. at 146 (in tax refund suit, the taxpayer has burden of proving not only that it overpaid its taxes but also the amount of its overpayment).

Under very similar circumstances, the Claims Court in *General Elevator* concluded that consideration to what competing companies were paying, and occasional sampling of travel costs (for motels in the travel areas) were *not* objective evidence that these payments reasonably approximated ordinary and necessary business expenses, when the employer had not required documentation or performed any "sound" analysis of such costs, but merely had relied on anecdotal evidence of costs and what competitors were paying. 20 Cl.Ct. at 347–349, 352.

■ Obviously, the employer-employee labor agreements alone cannot determine whether an allowance paid pursuant to such agreement does not exceed expenses reasonably expected to be incurred, due to the lack of arms' length negotiation and the obvious identity of interests in excluding from payroll taxes as much of the total compensation package as possible. *See Botany Worsted Mills v. United States*, 278 U.S. 282, 292, 49 S.Ct. 129, 133, 73 L.Ed. 379 (1929) (extraordinary, unusual and extravagant amounts paid by a corporation to its officers do not become "ordinary and necessary expenses" merely

because the payments are made in accordance with an agreement between the corporation and its officers). Thus, the amounts of the allowances were not "reasonably expected to be incurred" merely because they were paid pursuant to an employment contract.

American's reliance on *Boyd Brothers Transportation Co. v. United States*, 27 Fed. Cl. 509 (1993), *aff'd without op.*, 60 F.3d 843 (Fed.Cir.1995) is misplaced. The taxpayer in *Boyd* did not rely on the employer-employee agreement to establish that the amount of the travel advances was reasonably expected to be incurred, so the court did not consider whether the provision would have satisfied the regulations. *See id.* at 513.

It is therefore necessary to determine whether American has otherwise established the "reasonably expected to be incurred" requirement of the travel regulations' exemption from wages. In making this determination, the court will consider separately the allowances for overnight trips, turnaround trips and training trips.

*Overnight Trips*

American based its per diem rates on: (1) one or more labor negotiators' personal anecdotal impressions; (2) competitors' practices; (3) the rates paid by certain government agencies; and (4) a study with unknown sampling techniques or other indices of reliability. Whether Mr. Pasciuto in good faith relied on the study and his own experience in setting the per diem rate is not the issue, but whether it was reasonable for anyone to have done so under the circumstances. American failed to perform or commission any independent analysis of the actual expenses of its employees in setting the per diem rates. The rates seem instead to have resulted more from "copycatting" competitors' rates than from any analysis of actual costs. The evidence that American's per diem rates were driven by competitiveness with other airlines is not helpful to plaintiff, as it is equally consistent with a different motivation than compensating for employees' actual expected travel expenses, to wit, keeping up with its competitors' wage and benefit packages. *See* Pasciuto Decl., Exh. A, p. 16 ("whipsaw technique especially among pilots

is rampant in the airline industry.") Also: "I think you'll find that [American's] expense provisions for meals and etcetera were basically very close ... [a]nd if you found any difference, it was because of the leap frogging or timing of the (labor negotiations)." *Id.* at 26.

The court concludes that the sources of plaintiff's information are such that they cannot be relied upon; and therefore, an insufficient basis objectively to determine that plaintiff "reasonably expected these expenses to be incurred." Plaintiff's information sources are either inherently biased (the unreliable pilots' study), (the labor negotiator's personal experience), or immaterial to actual costs (what other airlines did).

It would be naive to ignore that the "meal expense" concession was tantamount to wage concessions in the context of a labor negotiation. The rates paid by other airlines are (were) susceptible to similar negotiating pressures. The travel cost study, conducted by a well-known consulting firm specializing in travel and living costs, studied total travel costs, not meal allowances alone, and apparently concentrated on high-cost locations, such as major cities (Manhattan), in which employees need not necessarily have stayed or eaten during their travels, and the sampling techniques, assumptions, information, and indices of reliability associated with this study are unknown.

■ As defendant points out, the $36 *per diem* payments for "meals" could not have been expected to be treated as a meal allowance, because employees received them for hours when they were at their crew bases (the time between reporting and the beginning of the flight, and between the end of the flight and the debriefing period) when they incurred no traveling expenses, and they were paid regardless of the city in which the employee would be incurring expenses or of whether the employee was aware at the time when a meal would likely have been consumed (or already was being provided). While the regulation does not require that the amount of the advance match the precise amount of travel expenses, *Boyd*, 27 Fed.Cl. at 512 n. 1, it does require that the advance represent a reasonable estimate of average

actual costs. Gen. Couns. Mem. 33,207, 1966 WL 15752 (Mar. 3, 1966).

■ However, inadequate evidence to prove this point was proffered. Further, government employees at this time received no more than $25 or $33 a day (depending on the locality) for meals and incidental expenses after July 1, 1986, and no more than $26 or $34 a day after October 9, 1988. *See* 51 Fed.Reg. 19660, 19663 (1986); 53 Fed.Reg. 37710, 37710 (1988). Government employees seeking actual reimbursement of expenses over the maximum rate (which reimbursement could not, under any circumstances, exceed 150% of the maximum rate) were required to itemize their expenses and to provide receipts for any individual meal costing over $25 and for other expenses when required by the employing agency. *See* 51 Fed.Reg. at 19669–19670.

The court concludes that plaintiff cannot, as a matter of law, based on the allegations in the complaint and the evidence supporting its motion for summary judgment, carry its burden of meeting the objective reasonableness standard of proof.

Nevertheless, it is reasonable to assume that some American employees, at least some of the time, must have incurred actual meal and other ordinary and usual business expenses (for example, on overnight trips when meals were not provided on board). However, plaintiff has proffered insufficient information to permit a fact finder to determine what proportion of the amounts paid by American would meet the test. *Cf.* Rev. Rul. 84–164, 1984–2.C.B. 63 (effective December 31, 1982), issued pursuant to I.R.Code § 274(d) and Treas. Reg. § 1.274–5, (allowing, without substantiation, a $14 per full day exclusion from income for meal expenses, reasonably expected to be incurred for overnight travel lasting under 30 days when the cost of lodging was paid directly by the employer to the lodging providers, a $44 per day exclusion from income for traveling expenses when lodging was not provided, and no meal expense deduction for turnaround trips.) Plaintiff not having sustained its burden of proving that any amount over $14 is objectively reasonable, the court cannot allow

the costs claimed for "meal" per diems. Defendant nevertheless, based on analogous guidance in Rev. Rul. 84–164 [10], has allowed $14 per full day as an amount that is reasonably expected to be incurred during overnight trips.

■ The per diem payments for overnight trips also are not excludable from wages (in any amount over $14 per day) for withholding or FICA purposes under I.R.C. § 3401(a)(19) and § 3121(a)(20), respectively, because it is not "reasonable to believe that the employee[s] will be able to exclude [per diem amounts over $14 per day] from income under section ... 132." That is because it was not reasonable for American to believe that its employees would be able to deduct from income, as a "working condition" fringe benefit under § 132(a)(3), any amount in excess of $14 per day of the overnight per diem payments.

The per diem payments for overnight trips qualify for the "working condition" fringe benefit exclusion from income only to the extent that "such payment would be allowable as a deduction under section 162 or 167." Although § 162(a)(2) allows a deduction from income for ordinary and necessary business expenses including traveling expenses while away from home, no deduction is allowed unless the person claiming the deduction meets the substantiation requirements of § 274(d). Therefore, unless American reasonably believed that its employees were keeping adequate records of their traveling expenses to meet substantiation requirements of § 274(d) for amounts over § 14 per day, American had no reasonable basis for believing that its employees could exclude from income as a working condition fringe, any amount of their overnight per diems over the $14 deemed substantiated amount. See Rev. Rul. 84–164.

American did not require flight crew employees to substantiate their travel expenses, but claimed it reasonably believed that they were keeping records adequate to meet the substantiation requirements of § 274(d). The only basis offered by American for this

belief was that, during the collective bargaining, the pilots' negotiating committee would, from time to time, bring in detailed records of what an unspecified number of pilots had spent on trips they had flown during the negotiations. Pasciuto Decl., Exh. A, p. 30. American's negotiator, Mr. Pasciuto, was leery of such records, however, indicating that they were prepared for purposes of bargaining leverage only, and American has offered no evidence that it had reason to believe that any detailed records of travel expenses were regularly kept. Again, the strongest impetus appears to be catch-up with other airlines' rates. Id. at 25–26.

Since it was not reasonable for American to believe that the flight crew employees were meeting the substantiation requirements of § 274(d), the only amounts that American could assume would qualify for the "working condition" fringe benefit exclusion from income would be those amounts that the IRS has determined to be deemed substantiated without proof of actual costs, i.e. $14 per day for its overnight per diem payments. See Rev. Rul. 84–164.

Therefore, defendant is entitled to summary judgment with respect to the per diem payments for overnight trips.

### Turnaround Trips and DFW-based Crew Training Trips

■ The travel regulations at § 31.3401(a)–1(b)(2) and § 31.3121(a)–1(h) do not incorporate an overnight concept (they do not expressly require, in order for the exceptions to withholding and FICA to be applicable, that the travel expenses be incurred in overnight travel.) See Central Ill., 435 U.S. at 30, 98 S.Ct. at 922. In United States v. Correll, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967), the Supreme Court restricted to overnight trips the travel expense deduction for meal costs under § 162(a)(2). However, the Supreme Court in Central Ill. held that this overnight rule did not apply to the withholding exception in

---

**10.** Rev. Rul. 84–164, while not directly applicable (since it addresses excludability from income

rather than wages), serves as useful guidance.

§ 31.3401(a)–1(b)(2). *See Central Ill.*, 435 U.S. at 30, 98 S.Ct. at 922.

To be excepted from withholding and FICA requirements, per diem payments for turnaround trips must qualify under Treas. Regs. § 31.3401(a)–1(b)(2) and § 31.3121(a)–1(h), which require that the payments be "reasonably expected to be incurred." The per diem payments for turnaround trips in this case do not meet this requirement.

The per diem for turnaround trips was paid to all employees, including pilots and flight engineers whose receipt of meals on board eliminated a meal expense.[11] In addition, while the flight attendants, who did not receive meals on board, would be reasonably expected to incur meal expenses on turnaround trips (as would employees on training trips), it is unlikely that they would incur most of the incidental expenses covered by the payments (such as dry-cleaning) on a turnaround trip. Under such circumstances, the meal allowance payments made for turnaround and training trips were expenses not "reasonably expected to be incurred" and were not exempt from withholding or FICA taxes under § 31.3401(a)–1(b)(2) and § 31.3121(a)–1(h). *See, e.g.,* Rev. Rul. 74–445, 1974–2 C.B. 325, 325 (when a "travel allowance" was paid to all workers in addition to a per-mile rate paid to those who used their own vehicle, the travel allowance was compensation rather than reimbursement for travel expenses).

■ Furthermore, the meal allowance payments for turnaround trips are not excludable from wages for withholding or FICA purposes under I.R.C. § 3401(a)(19) and § 3121(a)(20), respectively, because it is not "reasonable to believe that the employee[s] will be able to exclude such benefit from income under section . . . 132." That is because the meal allowance payments for turnaround trips do not qualify as a "working condition fringe" under § 132(a)(3) since such payments are not deductible under § 162(a)(2). *See* § 132(d); *Correll,* 389 U.S. at 302–03, 307, 88 S.Ct. at 447–48, 449–50.

■ American appears to concede that the allowances for turnaround and training trips would not, in and of themselves, be excluded from wages. Pl. Mot. at 29. However, it claims that it reasonably believed that the actual overnight trip expenses of its employees exceeded the amounts of the allowances for such trips so as to completely offset the small amount of the turnaround (and training) trip payments. American argues that the allowances for turnaround trips (and training trips) were therefore excluded from wages based on the "annual netting rule" established by Rev. Rul. 69–592, 1969–2 C.B. 193. In that ruling, the IRS held:

> unless it is reasonable to believe, under all the facts and circumstances known to the employer at the time of the reimbursement [or advance], that the total per diem allowances paid to an employee during the taxable year will exceed the total of his deductible travel expenses incurred while he is traveling away from home on business, no withholding of income tax is required with respect to per diem allowances paid to cover his meal expenses on trips that do not require him to stop for sleep or rest.

Rev. Rul. 69–592 does not support American's argument in support of the excludability of its turnaround (and training) trip payments. American has provided only company-wide figures for the proportion of total payments represented by payments for turnaround (and training) trips, not on the proportion of such travel for any employee(s). Rev. Rul. 69–592 applies on an employee-by-employee basis; that is, it allows an employer to exclude a particular

11. American contends that the boarded meals should not be considered in determining whether the meal allowances are includable in wages, citing Rev. Proc. 89–67, 1989–2 C.B. 795, 798, and Rev. Proc. 90–38, 1990–2 C.B. 363, 364. However, those revenue procedures merely address the method for determining the amount of an employee's travel expenses that are deemed substantiated (in the absence of actual substantiation), *not the amount that was reasonably ex-* pected to be incurred. *See* Rev. Proc. 89–67, 1989–2 C.B. at 798, and Rev. Proc. 90–38, 1990–2 C.B. at 364. Moreover, Rev. Proc. 89–67 (and Rev. Proc. 90–38 which amplified, modified and clarified Rev. Proc. 89–67) *does not apply to the* taxable years at issue here, since it is only effective with respect to meals and incidental expenses paid and incurred in taxable years beginning on or after January 1, 1989. *See* Rev. Proc. 89–67, 1989–2 C.B. at 800.

non-overnight travel allowance payment only where the employer, at the time of the payment, reasonably believes *that particular employee* will incur *deductible* travel expenses during the year in excess of the employer's travel allowance payments to that employee. It may well be that, even though payments for turnaround trips form only a small percentage of American's total annual per diem payments, some employees fly predominantly on turnaround trips and therefore receive most of their annual per diem allowances for such trips. Again, in order to benefit from the "annual netting" rule with respect to any employee, American must show, with respect to *that particular employee,* that it reasonably believed that the actual overnight trip expenses of such employee sufficiently exceeded the overnight trip payments made to the employee for such trips as to completely offset the turnaround (and training) trip payments to that employee. American has not produced any such figures.

Moreover, Rev. Rul. 69–592 exempts employers from withholding only where it is reasonable for the employer to believe that the total per diem allowances paid to the employee during the taxable year will not exceed the employee's total *deductible* travel expenses. It is not sufficient that the employee's total travel expenses exceed the total allowances if those travel expenses are not fully deductible. *See* Rev. Rul. 69–592, 1969–2 C.B. 193. Again, in order for the travel expenses to be deductible under IRC § 162(a)(2), the substantiation requirements of IRC § 274(d) must be met.

As previously discussed, American has not met its burden of proving that it had a reasonable basis for believing that its flight crew employees were meeting the substantiation requirements of § 274(d), and therefore that the employees could deduct from income any amount for travel expenses in excess of the $14 per day deemed substantiated amount for overnight trips. Since the per diem payments for overnight trips were $36 per day, it was not reasonable for American to assume that its employees' total deductible expenses would exceed the total per diem

payments for any of the taxable years at issue.

Therefore, defendant is entitled to summary judgment with respect to meal allowance payments for turnaround and training trips.

*Working Condition Fringe—Boarded Meals*

The meals provided to pilots and engineers on board were valued at $10. Defendant argues that plaintiff's per diem payments in excess of $14 per day were taxable wages, i.e. $22.00 per day ($20.80 prior to August 1, 1985 for pilots and flight engineers). During its audit, the IRS treated as wages only $6 per day of the $36 per day meal allowance. Therefore, even after the assessment, plaintiff underpaid its taxes by $16 per day with respect to the per diem payments. Therefore, unless plaintiff demonstrates that the value of the boarded meals exceeded $16 per day, plaintiff cannot show that it overpaid its payroll taxes. No such evidence has been proffered.

*De Minimis Fringe—American Express Vouchers*

■ Federal employment taxes need not be withheld from "any benefit provided to or on behalf of an employee [as to which] at the time such benefit is provided it is reasonable to believe that the employee will be able to exclude such benefit from income under section ... 132." I.R.C. § 3121(a)(20), 3401(a)(19). American contends that it was reasonable to believe that the American Express vouchers were excludable from American's employee's income as a de minimis fringe benefit under I.R.C. § 132(a)(4), 132(e). A de minimis fringe benefit is defined as "any property or service the value of which is (after taking into account the frequency with which similar fringes are provided by the employer to the employer's employees) so small as to make accounting for it unreasonable or administratively impracticable." I.R.C. § 132(e); Treas. Reg. § 1.1326–T(a). Plaintiff did not and, the court is persuaded, cannot, establish that it would have been administratively impracticable to account for the American Express vouchers.

American's argument that it was administrative impracticable to account for the benefit provided to each employee because American could not know which employees redeemed the vouchers, and for how much, fails for several reasons. First, difficulty caused by the employer's chosen accounting system (here, the decision not to include the employees' names on the vouchers) does not constitute administrative impracticability. Tech. Adv. Mem. 9148001 (Nov. 29, 1991) ("If this interpretation were valid, an employer could tailor its procedures to be administratively difficult for purposes of achieving de minimis treatment under section 132(e)."). The fact that all the vouchers were not used is irrelevant, since the value of a benefit for withholding purposes is determined when the benefit is conferred, not when the employee uses the benefit, and is not affected by whether the employee takes advantage of the benefit. *See* Treas. Reg. § 31.3501(a)–1T(1) (for purposes of employer's liability to collect and pay employment taxes, a noncash fringe benefit is deemed paid to the employee in the calendar quarter in which the benefit is conferred, not when the employee uses the benefit); Treas. Reg. § 1.132–6T(f)(2) (country club or health club membership is not excludable "regardless of the frequency with which the employee uses the facility"). In any event, an overwhelming proportion of the vouchers (97.4% of the value) was redeemed—$4,139,100 out of $4,250,000. Since each employee received $100, it should be a simple matter to account for the payments—$100 for each employee; $100 times the number of employees for the total amount.

The regulations published in the Federal Register on December 23, 1985, six months after the June 1985 issuance of the vouchers, but prior to the expiration of the vouchers in December 1985, expressly and specifically preclude treating cash or charge card benefits as a fringe benefit: "the provision of any cash fringe benefit (*or any fringe benefit provided to an employee through the use of a charge or credit card*) is not excludable as a de minimis fringe." Treas. Reg. § 1.132–6T(c) (emphasis added). Although § 1.132–6T had not yet been enacted when the vouchers were issued, it was clear from IRC § 132(e)(1) that cash or a cash equivalent would not qualify as a de minimis fringe since it is not unreasonable or administratively impracticable to account for a cash or cash equivalent benefit.

The fringe benefit provided through the vouchers, although not a cash fringe benefit, was a cash-equivalent fringe benefit. The parties dispute whether the vouchers could be redeemed only at restaurants or whether they could be redeemed at any business establishment honoring the American Express card. However, even if the vouchers could be redeemed only in restaurants, they would still be equivalent to cash given the large number of restaurants that honor American Express cards and the almost total lack of restrictions on use and transferability of the vouchers. *See, e.g., Changes with Respect to Prizes and Awards and Employee Achievement Awards,* 54 Fed.Reg. 627, 628, 631 (1989) (proposed rule that only "a nonnegotiable certificate conferring only the right to receive tangible personal property" was not equivalent to cash).

Moreover, American cannot argue that it "could [not] reasonably suspect that a withholding obligation existed," *Central Ill.,* 435 U.S. at 32, 98 S.Ct. at 923, where IRC § 132(e)(1) expressly provides that a fringe benefit does not qualify as a de minimis fringe unless accounting for the benefit would be unreasonable or administratively impracticable. Defendant therefore is entitled to summary judgment with respect to the benefit conferred by the vouchers.

### Conclusion

For the reasons stated above, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted.