**UNITED AIR LINES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–173T.

United States Court of Federal Claims.

Aug. 10, 2001.

Todd F. Maynes, Chicago, IL, for plaintiff.

William K. Drew, Washington, DC, with whom was Acting Assistant Attorney General Paula M. Junghans, for defendant.

## OPINION

MILLER, Judge.

This case is before the court after trial.[1] The Internal Revenue Code subjects wages received by an employee from an employer to withholding for federal income taxes and Social Security. To be decided is whether and to what extent per diems adjusted for on-duty hours and paid to reimburse travel expenses are considered "wages" exempt from tax liability under the "travel expense" exemption.[2] This legal question hinges on factual determinations as to whether the employer had an objectively reasonable belief that 1) the per diems were equal to or less than the actual travel expenses incurred, and 2) the travel expenses could be substantiated in an amount exceeding the per diems.

## FACTS

Facilitated by the parties' exhaustive stipulation on all other pertinent facts, the trial itself was a modest, focused endeavor that explored witnesses' recollections of actual travel conditions. From January 1, 1985, through December 31, 1987 (the "periods at issue"), United Air Lines, Inc. ("plaintiff"), paid a per diem of $1.50 per on-duty hour (not to exceed $36.00 per day) to its pilots and flight attendants (collectively referred to as "flight crew employees")[3] to reimburse

1. The record was closed on February 15, 2001. This opinion issues more than 90 days thereafter because the parties filed a Joint Motion for Suspension of Proceedings on March 12, 2001, in order to explore settlement. At the parties' request, the suspension was vacated by order entered on June 8, 2001, and thereupon the 90–day period recommenced.

2. Plaintiff preserved for appeal as a second issue whether, to the extent such per diems are considered "wages," any portions properly were excludible from gross income as "working condition fringe benefits."

3. During the periods at issue, plaintiff employed approximately 6,150 pilots and 12,000 flight attendants to operate its passenger aircraft and serve passengers.

them for traveling expenses incurred during both day and overnight travel. During the periods at issue, plaintiff was engaged in the business of furnishing air transportation of passengers and cargo over regular routes and on regular schedules.[4] The Internal Revenue Service (the "IRS"), determined that the entire per diem for day trips, and part of the per diem for overnight trips, qualified as wages for the purposes of Federal Income Tax Withholding ("FITW"), 26 U.S.C. ("I.R.C.") § 3402,[5] and deduction of taxes under the Federal Insurance Contributions Act ("FICA"), I.R.C. § 3102.

For scheduling purposes, each of plaintiff's flight crew employees was assigned to a home base termed the employee's "domicile." A flight crew employee would bid for and be awarded a particular series of flights (a "pairing") to work, which typically originated and terminated at the employee's assigned domicile. The large majority of pairings during the periods at issue required flight crew employees to spend one or more nights away from their domiciles ("overnight trips"). A small minority of pairings during the periods at issue brought the flight crew employees back to their assigned domiciles without "laying over." During the periods at issue, flight attendants typically traveled 13 to 15 days per month, while pilots, who are subject to strict federal rules requiring rest periods, typically traveled 14 to 16 days per month.

The terms and conditions of plaintiff's employment relationship with its flight crew employees were set forth in various collectively bargained contracts negotiated with the flight crew's unions (the "Union Contracts").[6] As required by the Union Contracts, pilots were paid a per diem at the rate of $1.50 per hour from January 1, 1985, through March 31, 1986, and $1.55 per hour from April 1, 1986, through December 31, 1987.[7] Also, as required by the Union Contracts, flight attendants were paid a per diem at the rate of $1.50 per hour throughout the periods at issue.[8] The per diem allowance "clock" for the fixed hourly rate ran from the time the flight crew reported for duty at their domiciles until the time a pairing returned them to those domiciles and they went off duty. The hourly rate at which the per diems were paid was determined through good faith, arms-length negotiations between plaintiff and the flight crew employees' unions. Because flight crew employees continuously traveled for plaintiff, requiring specific documentation for meals and incidental travel expenses would have been administratively burdensome. The per diem arrangement was thus designed to reimburse flight crew employees for meals and incidental travel expenses, without requiring them to retain and submit receipts for each individual expenditure.[9] During the periods at issue, the flight crew employees were not required to itemize or substantiate the expenses actually incurred in the course of their employment, and, in fact, no such itemized state-

---

4. Plaintiff provides passenger service to more than 173 cities around the world.

5. Citations are to the Internal Revenue Code of 1954, as amended and in effect at the relevant time.

6. The Union Contracts in force during the periods at issue were 1) the 1981 agreement between plaintiff and the air line pilots in the service of plaintiff, as represented by the Air Line Pilots Association, International; 2) the 1985 agreement between plaintiff and the air line pilots in the service of plaintiff, as represented by the same union; 3) the 1983–1986 agreement between plaintiff and the flight attendants in the service of plaintiff, as represented by the Association of Flight Attendants; and 4) the 1986–1987 agreement between plaintiff and the flight attendants in the service of plaintiff, as represented by the same union.

7. Pursuant to the pilot contracts, plaintiff paid the following amounts to its pilots: 1) in 1985, $545,926.00 for day trips and $13,089,518.00 for overnight trips; 2) in 1986, $757,605.00 for day trips and $18,182,513.00 for overnight trips; and 3) in 1987, $865,636.00 for day trips and $20,775,268.00 for overnight trips.

8. Pursuant to the flight attendant contracts, plaintiff paid the following amounts to its flight attendants: 1) in 1985, $1,321,831.00 for day trips and $22,443,180.00 for overnight trips; 2) in 1986, $1,878,158.00 for day trips and $35,685,003.00 for overnight trips; and 3) in 1987, $2,052,749.00 for day trips and $39,002,226.00 for overnight trips.

9. Defendant stipulates as to plaintiff's expressed purpose of the per diem arrangement, but not as to the amount.

ments of substantiation were submitted to plaintiff.[10]

Plaintiff's computerized crew scheduling system provided plaintiff with an accurate record of the assignments of flight crews, which plaintiff used to calculate the amount of the per diem paid to each employee. The per diems were disbursed on a regular basis in the check that would also include a flight crew employee's salary. The portion of these paychecks attributable to per diems was itemized separately on the check stub and in a monthly flight time record provided with the check.

For accounting purposes, and on its consolidated federal income tax returns for the years 1985, 1986, and 1987, plaintiff accounted for the per diems as travel expenses of its flight crew employees, and not as compensation, wages, or other similar payments.[11] Consistent with its treatment of the per diems as the reimbursement of travel expenses, plaintiff did not withhold FITW taxes or withhold or pay FICA taxes with respect to the per diems. Additionally, plaintiff did not report the per diems as wages or as non-wage compensation on the W–2 Forms issued to its flight crew employees, nor did it issue Forms 1099 with respect to the per diems.

Plaintiff duly filed an IRS Form 941, Employer's Quarterly Federal Tax Return (and subsequent amendments where appropriate), for each calendar quarter of the periods at issue. After an audit of plaintiff's employment taxes for the periods at issue, the IRS asserted that the full amount of the per diems paid for day trips and one sixth of the per diems paid for overnight trips should have been treated as wages subject to FITW and FICA taxes. The IRS thus treated as

wages 100% of the per diems paid for day trips and approximately $6.00 per 24–hour period of the per diems paid for overnight trips. Accordingly, the IRS assessed $5,899,516.00 in FITW taxes and $2,814,300.00 in FICA taxes against plaintiff with respect to the per diems. The IRS also assessed withholding penalties against plaintiff: $140,716.00 pursuant to I.R.C. § 6656 and $208,525.00 pursuant to I.R.C. § 6653.[12]

On June 24, 1992, plaintiff made an advance payment of liabilities to the IRS in the amount of $9,063,057.00 for the total amount of FITW and FICA taxes and I.R.C. §§ 6656 and 6653 penalties assessed as a result of the audit. On or about June 17, 1994, plaintiff duly filed IRS Forms 843, Claim for Refund and Request for Abatement, for each calendar quarter of the periods at issue, seeking a refund of all of the FITW and FICA taxes and I.R.C. §§ 6656 and 6653 penalties. On March 22, 1995, plaintiff filed Form 3363, Acceptance of Proposed Disallowance of Claim for Refund or Credit, and Form 2297, Waiver of Statutory Notice of Claim Disallowance, covering all of the FITW and FICA taxes and I.R.C. §§ 6656 and 6653 penalties.

## DISCUSSION

From August 1, 1985 through December 31, 1988, American Airlines, Inc. ("American"), a competitor of plaintiff's, paid its flight crew employees a per diem at a rate of $1.50 per hour. Litigation regarding the treatment of those payments for FITW and FICA purposes has been ongoing for several years. See *American Airlines, Inc. v. United States*, 40 Fed.Cl. 712 (1998), *aff'd in part, rev'd in part, and remanded*, 204 F.3d 1103

**10.** Plaintiff additionally paid the costs of lodging, ground transportation between airports and hotels, and parking for its flight crew employees directly to the providers of such services. In the instances when the flight crew employees paid such costs, they were required, under the terms of the Union Contracts, to account for such payments and submit receipts to plaintiff in order to receive reimbursement over and above the per diem amounts. Pursuant to the Union Contracts, plaintiff also reimbursed flight crew employees for the expenses incurred for cleaning their basic uniforms. When such costs were incurred and reimbursed, under the terms of the Union Contracts, plaintiff required its flight crew

employees to submit receipts or other proof of actual costs, which the flight crew employees did.

**11.** In February and March of 1985, plaintiff requested and received advice from two different law firms regarding whether cash payments to employees to reimburse them for business travel expenses were subject to FITW and FICA taxes following the enactment of the Deficit Reduction Act of 1984, Pub.L. No. 98–369. The law firms reached opposite conclusions.

**12.** See Joint Stipulation of Facts No. 25, filed Oct. 30, 2000.

(Fed.Cir.2000). The Federal Circuit's decision is the template for the court's legal analysis in the case at bar.

### 1. *Travel expense exclusion from the tax on wages*

Pursuant to the Internal Revenue Code, employers are required to withhold federal income taxes, I.R.C. § 3402, and deduct FICA taxes, I.R.C. § 3102, from their employees' wages. Under FICA, as defined by I.R.C. § 3121, wages are "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." For income tax withholding, under I.R.C. § 3401, the definition of wages is similar to I.R.C. § 3121, stating in relevant part that wages are "all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash."

The definition of wages is delimited by a host of exceptions, including an exclusion for "traveling expenses" from both FITW, established by Treas. Reg.[13] § 31.3401(a)–1(b)(2),[14] and FICA, Treas. Reg. § 31.3121(a)–1(h).[15] As the FITW and FICA travel expense regulations (collectively the "Travel Expense Regulations") are almost identical, a determination with respect to one will be applicable to the other. *American,* 204 F.3d at 1109. The Travel Expense Regulations have two requirements: 1) The amounts paid must specifically be for travel and other expenses incurred or reasonably expected to be incurred by the employee while on company business; and 2) the expense payments must be identified specifically as such at the time of payment. Both parties have stipulated that during the periods at issue, plaintiff satisfied the requirement that travel expense payments be identified specifically by separately identifying the amount of the per diems on its flight crew employees' paycheck stubs. Thus, the remaining issue to be determined under the applicable Travel Expense Regulations is whether plaintiff "reasonably expected" its flight crew employees to incur costs of $1.50 per on-duty hour both for day and overnight trips.[16]

### 2. *Costs reasonably expected to be incurred*

■ In a claim for a tax refund, the burden is on the taxpayer to establish "entitlement to the specific refund amount claimed." *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir.1998). Plaintiff claims that it is entitled to both the FITW and FICA travel expense exemptions for its flight crew per diems, so plaintiff bears the onus to show that it "reasonably expected" the flight crew employees to incur costs equal to or greater than the maximum per diem of $36.00 a day. Plaintiff presented four witnesses to demonstrate it had met the "reasonable expectation" requirement. The first three witnesses were flight crew employees or former flight crew employees for plaintiff and, as their testimony was similar, will be discussed together. The fourth witness was an expert in travel cost data. Defendant did not present any witnesses.

> Amounts paid specifically—either as advances or reimbursements—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages. Traveling and other reimbursed expenses must be identified either by making a separate payment or by specifically indicating the separate amounts where both wages and expense allowances are combined in a single payment.

---

**13.** Citations are to sections of the treasury regulations codified at 26 C.F.R. in effect at the relevant time.

**14.** Treas. Reg. § 31.3401(a)–1(b)(2) provides:
> Amounts paid specifically—either as advances or reimbursements—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages and are not subject to withholding. Traveling and other reimbursed expenses must be identified either by making a separate payment or by specifically indicating the separate amounts where both wages and expense allowances are combined in a single payment.

**15.** Treas. Reg. § 31.3121(a)–1(h) provides:

**16.** As noted, for a portion of the relevant period, the per diem for pilots was $1.55 per hour. The figure $1.50, or the maximum $36.00 per day, is used for convenience.

### 1) *Flight crew employees*

■ American, in its legal challenge paralleling this one, pointed to its collective bargaining agreements as providing proof of the required "reasonable expectation," citing Rev. Rul. 55–196, 1955–1 C.B. 492, and *Boyd Brothers Transportation Co. v. United States*, 27 Fed. Cl. 509 (1993), *aff'd*, 60 F.3d 843 (Fed.Cir.1995). The Federal Circuit held that American's reliance on the revenue ruling, as well as on *Boyd Brothers*, was misplaced in that a collective bargaining agreement containing specific amounts for traveling expenses to be paid in advance automatically did not make those amounts "reasonably expected." *American*, 204 F.3d at 1109–10. Presumably motivated by the Federal Circuit's ruling in *American*, plaintiff in the case at bar presented its flight crew employees to breathe life into the union agreements and address how the numbers were justified and developed.

Plaintiff's first witness, Sara A. Fields, joined plaintiff as a "stewardess" (the former term for flight attendant) in 1963, held multiple management positions for the in-flight service organization, and today serves as plaintiff's Senior Vice President for Onboard Service. From 1981 through 1985, Ms. Fields was the manager of labor relations, working with the Association of Flight Attendants, ("AFA"), which represented plaintiff's flight attendants. Ms. Fields testified regarding the negotiations involving plaintiff, AFA, and the Airline Pilots Association ("ALPA") during the early to mid–1980s.

She was involved directly in negotiating the 1983–1986 agreement between plaintiff and its flight attendants,[17] and indirectly involved with negotiating the 1986–1987 flight attendant agreement.[18]

Ms. Fields testified that, from management's perspective, "[t]he per diem was intended to reimburse flight attendants or pilots for the expense of the meals and related expenses that they would incur while they were on duty" for plaintiff. Management preferred an up-front per diem for expenses, rather than an "actual costs" method in order to avoid the "magnitude of the expense reports that [plaintiff] would have to review."[19] In determining what the contractual per diem ought to be, plaintiff's management considered its own experience traveling for both business and pleasure. In addition, management collected hotel menus from plaintiff's new international locations, and when plaintiff began flying to Asia, management conferred with a group called Organization Research Counselors. Plaintiff's management did not commission a formal study on domestic travel costs because it considered such a study to be redundant with its own travel experience. Essentially, according to Ms. Fields, the per diem offered by plaintiff was based on "what we would consume if we were traveling and staying in those hotels. And so we said they're entitled to eat whatever we would eat if we were staying at that hotel."[20]

Based on her experience from 1983 to 1986, Ms. Fields presented a breakdown of

---

**17.** Plaintiff's negotiating team for this time period had five permanent members: a chief spokesperson for the company who negotiated pilot and flight attendant contracts and four members who represented in-flight service.

**18.** According to Ms. Fields, the relationship between plaintiff and its unions "was very contentious." Due in part to airline deregulation beginning in 1978, plaintiff's negotiation style changed, and "[r]ather than coming to the table and striving to achieve jointly an industry leading agreement, [plaintiff] came to the table attempting to get things back that [it] had previously given." Thus, plaintiff had difficulty reaching agreements during this time and even "took a strike" with its pilots in 1985.

**19.** Ms. Fields further explained that plaintiff initially had started out

with a concept where we looked at the schedule and we reimbursed people for the specific meal period. We started out with breakfast, lunch, dinner, and a snack. But as our operation grew and we flew more flying [sic] on the back of the clock and we flew more flying around the clock, around the world, we couldn't establish relationships. When I might be having breakfast, somebody else was asleep, and when I was asleep they might be having dinner. So that's when we moved to we looked at what the total cost of the meals would be in a 24–hour period and then we prorated it hourly.

**20.** Plaintiff's flight crew employees, as a result of negotiations, generally stay in "first class hotels."

the estimated food costs she expected a flight crew member to incur in a 24–hour period: for breakfast (which she assumed would be in a hotel), $7.00 to $9.00; for lunch (which she assumed would be at an airport) $9.00 to $11.00; for dinner (which she said "is kind of an occasion if you're on layover") $18.00 to $25.00. She also quantified incidental costs flight crew employees might incur in a 24–hour period: $3.00 to $5.00 for snacks; and $2.00 to $4.00 for tips to van drivers and bellhops, telephone calls, and taxi fare to and from restaurants (costs typically not reimbursed by plaintiff). Ms. Fields stated that her 24–hour cost estimates were based on "the supposition of what our entire schedule was and ... the average of one-day, two-day, three-day, four-day and beyond trips." [21] Her estimates totaled $48.00 on the low end and $61.00 on the high end. She further testified that it was the position of management to not pay its employees a per diem that was greater than what the employees would spend.

Defendant developed two issues on cross-examination: whether plaintiff's payroll taxes were considered during labor negotiations and the availability of in-flight meals. The per diem rate for the 1980 to 1982 flight attendant agreement started at $1.15 and ended at $1.30. Challenging the reasonableness of plaintiff's per diem increase to $1.45 and $1.50, defendant characterized plaintiff's motivations as considering employee morale and wanting to offer competitive compensation packages, which Ms. Fields agreed was accurate. Defendant also asked if employee expenses such as payroll taxes had been considered during negotiation or suggested by the union, to which Ms. Fields responded in the negative.

Regarding the possibility of in-flight meals, Ms. Fields testified that under the terms of the 1983–1986 contract, plaintiff did not provide its flight attendants with free onboard meals. Flight attendants could request that a meal be boarded for them, but were required to make such a request 45 to 60 days before the trip via the union. If a flight attendant were to request an in-flight meal, the cost of that meal to plaintiff would be deducted from the employee's per diem.[22] However, Ms. Fields stated that such requests were "rare." Ms. Fields, who was an impressive and articulate witness, suffered damage to her credibility only when she admitted to being responsible for in-flight catering, rather than as a result of any questioning by defendant.

The two other employee witnesses presented by plaintiff were William C. Brashear, and Kathryn A. Hutchens. Mr. Brashear served as a pilot with plaintiff for 36 years, of which 25 years were spent as a captain, until his retirement in January of 2000. In addition to Mr. Brashear's considerable flight experience, he was a special agent member of the ALPA committee for the 1981 agreement with plaintiff and chairman of the committee for the 1985 agreement. Ms. Hutchens was employed as a flight attendant with plaintiff for approximately 30 years. She was also chairperson of the AFA Negotiations Committee, which joined with AFA labor negotiators in negotiating employment contracts with plaintiff.

Both Mr. Brashear and Ms. Hutchens testified regarding the typical work life of a flight crew employee: the distance one commuted from home to the domicile airport; the duties at the airport; the number of days a month spent traveling; the percentage of one-, two-, and three-day trips; and, of course, expenses incurred. Similar to Ms. Fields, both Mr. Brashear and Ms. Hutchens presented itemizations of their typical costs while working. Mr. Brashear's low-end total was $46.00. Ms. Hutchens' low-end total, which excluded any transportation, was $37.00. The court found both Mr. Brashear and Ms. Hutchens to be forthright and re-

---

**21.** Ms. Fields testified that approximately 15% of plaintiff's trips were day trips, 60% were two-day trips, and 10% were three-day trips. Plaintiff had an incentive to schedule the flight crew for long day trips in order "to make sure they always flew in excess of their minimum [flight time] guarantee."

**22.** For example, if the cost of an in-flight lunch to plaintiff is $4.00, a flight attendant eating that meal would lose $4.00 from his/her per diem, rather than the $7.00 estimated cost of an airport lunch.

freshing witnesses whose testimony was not diminished by defendant.

### 2) *Retrospective travel cost data*

Plaintiff's final witness was Rolfe Shellenberger, a senior consultant in travel management with Runzheimer International, a management and consulting firm that specializes in "geographical differences in business costs."[23] Qualified as an expert in the subject of business travel costs, Mr. Shellenberger testified about his analysis of plaintiff's per diems in relation to expected expenses for the cities to which plaintiff traveled during the periods at issue and conclusion that plaintiff's per diem of $1.50 per on-duty hour was an under-reimbursement of the costs one could reasonably expect.

To reach his conclusion, Mr. Shellenberger performed the following analysis. Using the number of overnight stays recorded in each city in plaintiff's computer system where overnight stays were actually scheduled, he applied

> the Runzheimer published daily travel costs for the periods involved from 1985 through 1987 and took one figure for each city, using that as the standard cost data, the three-meal average. The three-meal average is actually a weighted analysis of information that's derived from our research where we have a range, let's say, of $5.75 up to $9.35 for breakfast, [Runzheimer] come[s] up with a $7.25 figure perhaps based upon the preponderance of where meals are eaten in the restaurants of the hotels which [Runzheimer] used in a panel or as [its] sample. This has been statistically pretty well validated as being a fair method of establishing what business travel costs are for meals.

In the instances where plaintiff served a city that Runzheimer did not "list," Mr. Shellen-

berger would pick a comparable city as a "designated alternate."[24] His analysis also included incidentals, ranging from $4.00 to $8.00, with $8.00 applying to the most expensive cities and $4.00 to the cheapest.[25]

Mr. Shellenberger's testimony provided an analytical confirmation of plaintiff's convincing anecdotal evidence that it reasonably expected its flight crew employees to incur the costs of the contractual per diems. Defendant takes issue with the fact that plaintiff did not have access to this information at the time the per diems were set. The court holds that it would be unfair to require plaintiff retroactively to demonstrate "objective" proof of its reasonable belief during the periods at issue for two reasons: 1) The requirement that the belief be objectively verifiable is not contained in the Travel Expense Regulations; and 2) if the IRS now requires taxpayers to show objective reasonable belief, it must allow such a study to be performed with the benefit of hindsight.

### 3. *The per diem as personal service compensation*

Simultaneous with its litigation in this court, plaintiff also pursued a parallel claim in the United States Tax Court, *i.e.*, plaintiff took the position that it could deduct the per diem allowances in excess of $14.00 per day as "personal service compensation" under I.R.C. § 162(a)(1). The Tax Court recently issued its decision in favor of plaintiff, confirming that plaintiff could deduct the per diem allowances paid to its flight crew employees for both day and overnight trips. *See UAL Corp. v. Commissioner*, 117 T.C. No. 2 (July 13, 2001).

At the outset of trial, this court queried the parties about the impact one decision

---

**23.** Mr. Shellenberger gave a brief history of Runzheimer International, stating:

> It started out in 1933 as a result of Rufus Runzheimer's discovery that there is a significant cost difference for business vehicle acquisitions depending upon the geography, wherever you were. And he started selling these data to people in businesses who needed to know where they should buy their cars or where they should license their cars and various other ways in which they might reduce their costs.

> This was extended into living costs and eventually got into travel costs.

**24.** In some cases a comparable city is chosen based on geographical proximity. In other cases the comparable city is a similarly sized city that has similar tax laws or other factors that affect the price of meals.

**25.** Runzheimer performed a similar analysis for the World Bank using the three-meal total estimate, plus incidental expenses.

would have on the other. Plaintiff stated that the Federal Circuit, per its *American* decision, narrowed the issue in the instant case to the "reasonable expectation of costs" test. Defendant concurred that the issue in the case at bar was whether plaintiff could prove the reasonable expectation that its flight crew employees would incur costs over $30.00 per day.[26] In other words, the cases have proceeded on parallel tracks, and plaintiff, in the first instance, will elect its preferred treatment of the reimbursements.

## CONCLUSION

The court finds and concludes that plaintiff had an objectively valid basis for treating the amount for meal allowances for its flight crew employees as reimbursable expenses. The amounts, therefore, were exempt from the withholding and deducting requirements under FITW and FICA. Accordingly,

**IT IS ORDERED,** as follows:

1. Plaintiff is entitled to judgment on the facts and law.

2. By September 28, 2001, the parties shall file a stipulation as to the amount of refund due plaintiff.

---

**26.** The average government per diem during the periods at issue was $30.00, which the IRS used as the presumptively reasonable per diem for overnight travel expenses.

